UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA          Case No. 3:25-cr-00073-MMH-SJH

vs.                               April 2, 2025

BRADEN HUSTON HOBBS,              9:13 a.m. - 10:35 a.m.

    Defendant.                    Digitally Recorded

_____

**DIGITALLY RECORDED ARRAIGNMENT/DETENTION HEARING**

BEFORE THE HONORABLE SAMUEL J. HOROVITZ
UNITED STATES MAGISTRATE JUDGE

<u>A P P E A R A N C E S</u>

GOVERNMENT COUNSEL:
**ELISIBETH ADAMS, ESQUIRE**
United States Attorney's Office
300 North Hogan Street, Suite 700
Jacksonville, FL 32202


DEFENSE COUNSEL:
**NOEL G. LAWRENCE, ESQUIRE**
Law Office of Noel Lawrence
101 East Union Street, Suite 200
Jacksonville, FL 32202


OFFICIAL COURT REPORTER:
Katharine M. Healey, RPR, RMR, CRR, FPR-C
PO Box 56814
Jacksonville, FL 32241
(904) 301-6843
katharinehealey@bellsouth.net


(Proceedings recorded by electronic sound recording;
transcript produced by computer.)

I N D E X

GOVERNMENT'S PROFFER................................... PAGE 4

DEFENDANT'S PROFFER................................... PAGE 23

DEFENDANT'S WITNESS:
**KELLY HOBBS**
   DIRECT EXAMINATION BY MR. LAWRENCE.................. PAGE 28
   CROSS-EXAMINATION BY MS. ADAMS..................... PAGE 38

QUESTIONS OF THE GOVERNMENT BY THE COURT.............. PAGE 46

GOVERNMENT'S PROFFER (CONTINUED)...................... PAGE 48

DEFENDANT'S PROFFER (CONTINUED)....................... PAGE 51

COURT'S RULING ON DETENTION........................... PAGE 53

ARRAIGNMENT PROCEEDINGS............................... PAGE 56

P R O C E E D I N G S

April 2, 2025                                      9:13 a.m.

- - -

COURT SECURITY OFFICER:  All rise.  The United States District Court in and for the Middle District of Florida is now in session.  The Honorable Samuel J. Horovitz presiding.

Please be seated.

THE COURT:  Good morning.  This is *United States of America vs. Braden Huston Hobbs*, 3:25-cr-73-MMH-SJH.

Ms. Adams is here for the government.  Welcome.

MS. ADAMS:  Good morning, Your Honor.  Also with me at counsel table is ATF Special Agent Mark Mutz.

THE COURT:  Welcome.

Mr. Lawrence is here for Mr. Hobbs.  Welcome.

MR. LAWRENCE:  Good morning, Your Honor, yes.

THE DEFENDANT:  Good morning, Your Honor.

THE COURT:  And Mr. Hobbs is here as well.  Good morning.

And we're here for a detention hearing and arraignment.

Mr. Hobbs, at the last hearing I had appointed Mr. Lawrence, but you had also expressed an interest in possibly retaining alternate counsel.  Did you -- have you determined that you wish to proceed with Mr. Lawrence?

THE DEFENDANT:  I haven't been able to have that

discussion.

THE COURT:  All right.  Well, a discussion as far as whether you were able to obtain --

THE DEFENDANT:  Correct.

THE COURT:  -- other counsel?  Okay.

THE DEFENDANT:  Correct.

THE COURT:  Is that something you still wished to do prior to the detention hearing, or do you wish to proceed for purposes of the detention hearing and arraignment with Mr. Lawrence since you haven't been able to obtain alternate counsel at this point?

THE DEFENDANT:  We'll proceed today.

THE COURT:  All right.  Anything else that we need to discuss from either side before we proceed?

MS. ADAMS:  Nothing from the United States, Your Honor.

MR. LAWRENCE:  Nothing from the defense, Your Honor.

THE COURT:  All right.  Let's -- let's start with the detention hearing.

Ms. Adams.

MS. ADAMS:  Thank you, Your Honor.  If it may please the Court.

Your Honor, this is a case where there is a rebuttable presumption in favor of detention.  Pursuant to 18, United States Code, 3142(e)(3)(A), it's the position of the

United States that there's no condition or combination of conditions that would reasonably ensure that the defendant is both not a flight risk or a danger to the community.

Your Honor, the -- in determining whether or not the Court should release the defendant, the Court should take into consideration the nature and circumstances of the offense, including whether the offense involves, among other things, firearms or controlled substances. In the defendant's case, Your Honor, we have both of those things.

This investigation began when agents with ATF received information that firearms that were purchased by the defendant were recovered during the execution of a search warrant in St. Johns County. During that warrant execution, deputies found firearms and a large quantity of narcotics.

The firearm that was recovered that is tied back to the defendant was purchased by the defendant 42 days prior to its recovery, and it was found in the possession of a multi-time convicted felon.

Through further review of purchase records relating to the defendant, ATF learned that the defendant was the original purchaser of a firearm that was recovered during a search warrant execution by the Jacksonville Sheriff's Office in March of 2023, as well as a separate search warrant execution in August of 2023.

At least three guns that were purchased by the

defendant were recovered in that August of 2023 search warrant execution, and that residence was being used to traffic illegal firearms.

Your Honor --

THE COURT:  I'm sorry, the residence where the guns were ultimately . . .

MS. ADAMS:  Recovered, yes, Your Honor, in August of 2023.

Your Honor, the time-to-crime is a measure that's used by law enforcement officers to determine how long is -- the length of time in between the recovery of the firearm by law enforcement and the original purchase date.  And a notable indicator of illegal firearms possession or illegal trafficking is when that firearm is recovered within less than one year. That indicates that there's a high likelihood of firearms trafficking or illegal possession.  And the lower the time-to-crime, the higher the indicator of trafficking.

In this case there's been multiple firearms that have been recovered by law enforcement officers where the time-to-crime is less than 45 days where those guns have been purchased by the defendant.  So there's a very quick turnaround in the guns that the defendant is purchasing and then their recoveries by law enforcement officers.

In addition to these recoveries, the Florida Department of Law Enforcement and ATF conducted an undercover

operation wherein they purchased a -- or conducted a series of controlled purchases from two individuals down in St. Johns County.  Several of those firearms also traced back to the defendant, and we have been able to confirm through records tracing that at least one of those individuals was a regular customer of firearms of the defendant.

One of the complications, Your Honor, that we have had in this investigation is these e-traces that law enforcement uses the trace the original purchaser of firearms, it does not show any secondary purchasers or even third purchasers.  It only shows the person that originally purchased the firearm.  So if firearms were being purchased from pawnshops or other secondhand licensed dealers, then those purchases will not show up on the trace.

So unfortunately, we know of several guns that have been recovered by the defendant.  But the defendant was purchasing his firearms from a lot of different locations, including pawnshops and secondhand locations that are licensed by the federal government, and so it's unclear at this time how many guns purchased by the defendant have actually been recovered by law enforcement because that requires, essentially, some reverse tracing.

Your Honor, when the defendant would purchase his firearms, as I stated, he would purchase these guns from, typically, licensed sellers.  When he would go in to purchase

these guns, he would fill them out -- fill out an ATF Form 4473.  And on that form he would indicate that the guns were meant for him, that he was not a controlled substance user or addict, and that the guns were not being used in the furtherance of any other felonies.  And the defendant then signed each of these forms indicating that his answers were true.  However, Your Honor, these were not true statements.

The defendant, for example, on the August 17th -- or, I'm sorry, the April 17th, which is one of the counts in the indictment, the defendant completed ATF Form 4473 for the purchase of multiple firearms, which included a Glock pistol. He indicated that he was the actual transferee of that firearm and again certified that that answer was true.

However, the defendant had advertised that Glock for sale multiple days before he ended up actually going in and completing the purchase of that firearm.  He was working on securing a buyer for that firearm.  And one of the individuals that we was advertising that gun to and attempting to sell it to was a known drug dealer and a known drug user.

He was also a known -- the defendant himself was also a known drug user at this point, and so therefore he made false statements on that ATF Form 4473, in addition to many of the other forms that he completed during the course of his illegal conduct.

The defendant would advertise many of these guns for

sale before he ever completed the ATF forms.  He would often describe firearms as being pre-sold or stating that he had inventory on the way.

Your Honor, in deviating just slightly from the firearms transactions, in June of 2024 the defendant was arrested by the Jacksonville Sheriff's Office.  That arrest was completely separate from our investigation.

The defendant was found by the Jacksonville Sheriff's Office and Jacksonville Fire and Rescue passed out behind the wheel of his car in the middle of an intersection.  JFRD and Jacksonville officers spent quite some time attempting to rouse the defendant and wake him up.  When they finally were able to get the defendant to come through [verbatim], he exhibited multiple indications of impairment.  He denied taking anything at that time but advised that he did have a history of drug abuse.

The defendant also indicated that he had been coming from Orlando but then later changed his statement to state he was coming from Daytona.

During the course of the investigation the defendant consented to a urinalysis, which has been tested by the Florida Department of Law Enforcement.  That sample was positive for numerous controlled substances, including amphetamines, methamphetamines, cocaine, cocaethylene, alprazolam, and THC.

During a lawful search of the defendant's car in that

case, the officers found approximately 330 grams of cocaine, 17 grams of Adderall, vacuum-sealed baggies, small clear baggies, and a few hundred rounds of ammunition.

Additionally, Your Honor, there was an empty cardboard gun box in the back of that car.  And the serial number on that gun box traces back to one of the guns that was purchased during the controlled purchases by FDLE and ATF.

Your Honor, we also have multiple witnesses in this case that we have spoken with and interviewed, and they have advised that the defendant has advertised dozens of firearms to them.  They were introduced to the defendant as a, quote, arms dealer.  They also paid the defendant in cash for the purchase of these firearms.

They indicated that they would often place orders with the defendant for guns or ask him for specific types of guns, which the defendant would then go out and get and sell to them.

The defendant knew that these individuals were drug users, drug dealers, or were going to turn around and resell the guns themselves.  In addition to that, the defendant would trade guns for drugs.

These witnesses have also indicated that they purchased -- they've also purchased drugs from the defendant himself, or they knew that the defendant sold drugs, including Adderall, Xanax, and cocaine.  Some witnesses have described

the defendant as having kilos of cocaine.

Your Honor, through the course of this investigation we have also had an opportunity to review numerous records through grand jury subpoenas.  The bank records were reviewed in this case and showed that in approximately two-and-a-half years, the defendant had over $80,000 in ATM cash deposits alone into his account.  He has a large volume of peer-to-peer transactions, which include platforms such as Venmo and CashApp.

Your Honor, in all, the bank records show that the defendant had approximately $235,000 in deposits into his account in this small period of time, and only approximately 23,000 of that is traceable to legitimate sources of income.

The -- in the review of the firearms purchase records, Your Honor, we have been able to determine that the defendant purchased approximately 121 firearms between March of 2022 and June of 2024 from three different licensed vendors. Between January 17th of 2024 and June 24th of 2024 the defendant purchased 67 of those firearms.

Unfortunately, Your Honor, with the way that the databases are set up, we have no way of knowing other vendors that he may have been purchasing these firearms from.  These are just the three that we have been able to identify at this time.

Additionally, the defendant has advised other

individuals that he has multiple sources of supply of firearms out of state, including Kentucky and Georgia.  And whether or not this is conjecture on the part of the defendant or whether this is actual reality we may never know as those firearms would be untraceable.

In addition, Your Honor, to all of this, we obtained a federal search warrant for the defendant's iCloud.  And that iCloud is voluminous; approximately a terabyte of data.

In the defendant's messages he's a self-proclaimed firearms dealer, telling people, for example, quote, I deal in firearms and having anything you could want, end quote.

He makes indications that he's dropping off inventory.  In the context of that conversation it's clear that he's referring to firearms.  He describes dropping off this inventory in Miami, other locations throughout Florida, as well as Georgia.

The defendant's communications contain numerous statements describing the sale of firearms, the sale of cocaine, the sale of Adderall and other controlled substances. He sends messages to his customers advertising pricing in varying quantities of these illegal substances.

In addition to that, Your Honor, he seeks out some of his customers to then sell drugs for him on his behalf.

In addition to this, there is extensive conversation about the defendant's illicit drug usage, including the use of

shrooms, cocaine, Adderall, clonazepam, et cetera. The defendant sends images of these items. He uses code words or slang to try and conceal the actual identity of what he's discussing. And we also have audio recordings of the defendant advertising these guns and drugs for sale.

In the communications the defendant discusses that he regularly carries a firearm with him while he's dealing or possessing guns, and we have several witnesses that have corroborated that as well.

Your Honor, as I've indicated, the defendant is also regularly asking his -- other individuals to help find him buyers for these guns and drugs so that they can turn them around and further continue the trafficking of these firearms.

The defendant directs his customers to conceal the nature of these transactions, requesting that when they're doing these peer-to-peer transactions that they put things such as "rent" when they are transferring money via CashApp or Venmo when they're discussing the sale of guns or drugs. He provides advice to other individuals on how to conceal their illegal activity from law enforcement, and he provides explanation on how he himself has concealed his illegal activity from law enforcement.

Your Honor, the defendant's iCloud warrant essentially contains a ledger and a diary of all of the defendant's interactions and dealings.

Your Honor, in a brief snapshot of some of these communications, for example, the defendant at one point sends a photo of his then-girlfriend and states, "Ms. Peru meets Mr. American Cocaine Addict Firearms Trafficker."

In another message he states that he just sold another individual three ounces of cocaine.

He then further goes on in another communication to state, quote, I have just ordered very much ammunition and new firearms.  I will be packaging and distributing to my clients today per usual, end quote.

In addition to this, Your Honor, he's advertising these firearms for sale to convicted felons.  These individuals are responding with messages such as, "Damn, bro.  I wish I wasn't a felon," to which the defendant then responds, "Well, you can make referrals, no?"

He, again, asks buyers to -- or to find buyers for guns, stating, "Find me a buyer for the MPX Copperhead at $1700."

In addition to that, in just, again, another very brief snapshot of the overwhelming communications that we have, the defendant refers to his drug usage stating, quote, 'bout to snort a massive line of cocaine and watch this on big screen, full blast, surround sound in the house, end quote.

Or in another communication says, Yeah, I'm on about 60 milligrams Adderall, which is a lot for me, and two gummies,

one earlier today and one like two hours ago, and I am high as a f-u-c-k-i-n-g SpaceX rocket.

Your Honor, there are numerous communications like this, dozens, if not hundreds, that read all the same way detailing his transactions.

The defendant's conduct is inherently dangerous to the community.  And given the ongoing dangers that our community faces with firearms, let alone selling firearms that cannot be traced, and including the sale of firearms to prohibited people, this poses a very significant danger to our community.

Your Honor, considering the defendant's history and characteristics, the defendant is only 27 years old and he does have a relatively minor criminal history as an adult.  However, that does not negate his conduct or his actions.

The defendant has managed to elude the detection of law enforcement officials for quite some time even though he was heavily involved in his illegal activity.

At one point the defendant describes to another individual he's communicating with that he's been involved in drug dealing for approximately 11 years.

Your Honor, the pretrial services report shows that the defendant has pending charges for driving under the influence and trafficking in cocaine.  That fact -- the facts of that are what I've previously described to Your Honor from

June 26th of 2024.

On July 7th of 2024, following that arrest, the defendant was incarcerated at the Duval County Jail.  He was given multiple commands by correction officers to clear the doorway to let another inmate in, and the defendant refused to comply with lawful commands.

When the officers opened the cell door, the defendant punched one of the corrections officers in the face and then continued to resist and strike at the correction officers to the point that they had to deploy a taser to get the defendant to comply.  Two of the officers did sustain injuries during that incident.

Your Honor, I would also note that the defendant has had no bond conditions in place during the point that he's been out on pretrial release.

Your Honor, the pretrial services report also mentions that there was a --

THE COURT:  I'm sorry, go back to the -- is that the final -- the battery on a law enforcement officer what you were just describing, or --

MS. ADAMS:  Yes, Your Honor, that is --

THE COURT:  -- is that something else?

MS. ADAMS:  No, that's the battery on a law enforcement officer on page 5 of the pretrial services report.

THE COURT:  And why does that say June 26th on the --

is that a --

MS. ADAMS:  I'm not sure, Your Honor.  The Arrest and Booking Report itself says that the incident happened on July 7th.

THE COURT:  Okay.

MS. ADAMS:  So that might just be a scrivener's error.

THE COURT:  So this is while he was in custody on the trafficking in cocaine, possession, those other charges?

MS. ADAMS:  Yes, Your Honor, that's correct.

THE COURT:  From the end of June?

MS. ADAMS:  Yes, Your Honor.

THE COURT:  All right.  And then when was he released?

MS. ADAMS:  He would have been released on bond on July 9th of 2024.

THE COURT:  All right.

MS. ADAMS:  Your Honor, in addition to those indicators of his history and characteristics, the pretrial services report indicates on page 3 that the defendant was the subject of a Baker Act in 2020.  The pretrial services report notes that the docket reflects an *ex parte* order denying the involuntary examination.  However, in reviewing the actual order to that, it indicates that the judge at that time believed that a Marchman Act was more appropriate and not a

Baker Act and so advised the complainant to refile.

In the actual complaint, the complainant describes the defendant having aggressive behavior, threatening other individuals with firearms, being extreme and erratic.

In addition to that, Your Honor, the defendant has been the subject of two separate petitions for injunction in which the complainants in those injunctions indicated that the defendant threatened to put bullets in the head of one of the petitioners, indicated that he was going to, quote, spray their house with firearms.  One of the petitioners stated they believed the defendant had discharged a firearm outside of their home and that the defendant had repeatedly made threats to shoot them and cause them physical harm.

In the course of the defendant's communication, the defendant describes multiple times how he was driving under the influence.  And this is all prior to his DUI arrest in June of 2024.  He has multiple occasions where he was DUI, he got into car accidents, and then fled from the scene of those car accidents.

This is reflected, for example, in a call report from the St. Johns County Sheriff's Office in May of 2023 wherein the complainant of that indicated that the defendant had crashed into a power pole and then left the area, telling the complainant that he was, quote, gonna go, end quote, before he ran off.

Further, Your Honor, throughout the course of the defendant's conduct he's regularly rented cars and used these rental cars to conduct his illegal activity. This concealed both his identity and reduces his risk of detection by law enforcement.

The defendant also has multiple indications in his communications that he's been involved in armed robberies while he's been conducting deals. For example, at one point he sends a message that states a racial slur and then states, "Tried to rob me last night so I stole his gun." He then goes on to describe a dispute with what he refers to as "the Puerto Ricans" in which he indicates that guns were drawn during the course of that conduct.

He has another communication where a firearm -- a Snapchat screenshot from the defendant is sent to the defendant, and the defendant then states, "That's the gun I robbed him for."

There's more than one instance like this, Your Honor, where the defendant describes deals that took a turn and resulted in violence or guns being drawn.

In looking at factors of flight, Your Honor, the defendant does have every incentive in this case to flee. If he remains for prosecution, he faces lengthy imprisonment and a five-year minimum mandatory. His maximum total penalty should the Court run them consecutive is 95 years.

The defendant has communications that indicate that he is a flight risk.  At one point he says, quote, I'm running red lights, going a hundred with loaded guns and cocaine on me at 1 a.m.  I wasn't about to get stopped by nobody; not the Puerto Ricans, not the feds, nobody was stopping me, end quote.

He again describes a situation where he had an outstanding warrant for his arrest, so he fled the state and hid in the hills in Pennsylvania at a family's estate in order to avoid detection.  He describes that he was unable to fly and had to drive that way because if he flew, they would have arrested him at the airport.

He then sends another image to another individual regarding this outstanding warrant and tells the person, quote, When you flee the state and they re-call your arrest warrant cuz you paid your attorney a fat wad of dirty money, end quote.

In addition to communications like this, the defendant provides numerous descriptions of how he's previously eluded law enforcement officials and evaded police cars.

In one example he sends an image of that same order to re-call capias and then states, quote, I love fleeing and eluding federal agents.

And again, whether or not this is conjecture by the defendant, we have to take this very seriously given the defendant's activity that he's currently been involved in and the overwhelming weight of the evidence against him.

The defendant's communications make it very clear that he's been advised by numerous family members and friends that he needs to stop what he's doing or that he needs to ensure that he's complying with the law, yet the defendant never takes any of those stops.  In fact, he laughs it off and he blatantly disregards the law and exhibits a complete and willful disrespect for the law.

Your Honor, in also looking at the pretrial services report, the defendant has been out on bond and yet he's still engaged in criminal conduct.  According to the defendant's own self admission, he continued to use marijuana, which is still an illegal substance.  Given that he's using it, that means he's still clearly engaged in drug dealing since he would have to be getting that marijuana somewhere.

The defendant was evasive in answering the questions of pretrial services, and his mother was unable to corroborate most of the information that the defendant provided.  This would be indicative that the defendant would not be compliant if he was on release.

In addition, Your Honor, the defendant was dishonest with pretrial services.  He indicated -- I believe that's on page 2 of the pretrial services report -- yes, Your Honor, page 2 -- in his employment and history that he has been working as a realtor making $15,000 a year.  However, by his own admissions in his communications, he tells his friends that

he had no 1099s and no W-2s related to his real estate, and he further states, quote, I didn't sell shit as a realtor, end quote.  We also know that the defendant did not have this level of income after a review of his tax and bank records.

Your Honor, the defendant's been regularly engaged in the illegal business of selling drugs and selling guns, both of which are inherently dangerous to the community.  He's managed to fly under the radar and conduct his illegal activity elusively for a lengthy period of time.  There is no reason to trust that the defendant would not now try to evade detection again since he's now facing significant consequences for his actions, including up to 95 years of imprisonment and a five-year minimum mandatory.

Your Honor, the weight against the defendant in this case is incredibly strong.  And the defendant's history and characteristics demonstrate that the defendant is a flight risk as well as a danger to the community.  The defendant has repeatedly been described as having a violent and explosive temper as well.

Your Honor, there is no condition or combination of conditions that would reasonably ensure the safety of the community or ensure that the defendant is not a flight risk.  And it's the position of the United States the defense will be unable to overcome the presumption in this case.

THE COURT:  Thank you.

Mr. Lawrence.

MR. LAWRENCE:  Thank you, Your Honor.  May it please the Court.

Your Honor, let me start a little bit where the government left off, which is the social media exaggerations of a young kid in the 20s.  And I submit to the Court a lot of it sounds like just that:  exaggerations or speculations or even hyperbole.

As an older practitioner, it would give a lot of us concerns or consternation, but at the end of the day, when you see these kids pretending to act like they're doing X, Y, and Z, it really doesn't mean that they're actually doing X, Y, and Z.  So I would ask the Court to -- I did not object.  I think the Court should be aware of it, but I don't -- I don't think the weight is very credible in this particular case.

I would also bring to the Court's attention with regards to the crimes in state court, that even though he was arrested back in June 2024 and there was this incident at the Jacksonville Sheriff's Office detention center, that the judge in both cases -- probably not the judge in the same case -- did allow a bond.  And bond for the BLE, the battery on law enforcement charge, was only $10,000.  He was released around the same time as the other charge.  So bond was -- with all that happened, all that was said, bond was allowed in that situation.  And I -- it's a pending case, so I don't know much

about what the evidence is or the credibility of the witnesses or what actually happened.

But I want to point out to the Court that with regards to the -- the DUI, which is what started that June 26th, 2024, case, he gave a breathalyzer and it was negative.  It was zero on both occasions according to the arrest report.  There were two samples of breath, both resulting in 0.000.

The arrest report doesn't show anything else about drug use, but I would note that Mr. Hobbs was pretty candid with pretrial yesterday and indicated that there would probably be marijuana in his system.  Apparently he bought it at the smoke shop recently.  It was legally purchased at the smoke shop.  And that's a part of the dilemma that he has in terms of his addiction.

And he is currently being treated by a drug interventionist in Jacksonville Beach.  That information was provided to pretrial services.  And so that -- and that would go into the calculus in terms of what we're asking the Court to allow in terms of the terms and conditions that he would be willing to submit to.

Another term and condition that Mr. Hobbs would be willing to submit to is no internet use at all.  There is a problem with using the internet, and so he's willing to submit to no internet use.

He's also willing to submit to a third-party custodian.

It is remarkable to note that even though he was arrested by himself in a car that he had no firearm in the car. And they have not indicated that he had any firearm when he was arrested this week.

The evidence does show that he has contact with firearms so far.  He's not a convicted felon.  He is an addict. That's also a problem, but he hasn't been charged for possession of firearm by an addict.

And with regards to the evidence, I don't have all the evidence -- I don't have any of the evidence at this point. But even the -- what the government has presented -- Your Honor, we're at the preliminary stage of the detention.  This is whether Mr. Hobbs would be available to attend court, to be available to meet with his attorney, and be available to come to trial.

There's nothing in his record, as lengthy as the government might feel it is, to suggest that he has been a problem child on probation or supervised release or a bond. And so we're limited at the lens at this point; it's really whether someone like Mr. Hobbs would be able to follow the rules and attend court and the proceedings until the trial is held.

And with the fact that his mother, with whom he lives

in St. Johns County, is here, I would be tendering her as a third-party custodian if the Court would be so willing, so that -- to ensure that not only Mr. Hobbs observes the terms and conditions of the Court's order, but also his mother is given the opportunity to not only be responsible for his supervision, but also to ensure that she is the individual who will notify the pretrial services of any violations or any actions -- negative actions by Mr. -- Mr. Hobbs.

Mr. Hobbs has been a lifetime member -- resident of this -- this Middle District of Florida.  There's no flight risk at all.  He's -- and even though he has a passport, he's willing to submit the passport to the clerk not to travel outside of the tri area, which would be the Jackson- -- the Duval, St. Johns, Nassau County area.

We believe, Your Honor, that there is sufficient terms and conditions that can be fashioned to allow Mr. Hobbs to be on bond while this case is pending and for this case to proceed to trial without him being -- without him being detained as a punitive measure by the government simply because they have one terabyte worth of social media or 50 gigabytes worth of investigations that we'll have to go through and ferret out and try to make heads or tail of it -- out of it, because there's always three sides to any story.  You're going to have the government's side, you're going to have the defense, and you're going to have something in the middle.

So at this point, Your Honor, I think the Court should allow Mrs. Hobbs to testify as a third-party custodian.

THE COURT:  Okay.

Ma'am.

While she's approaching, Mr. Lawrence, let me ask, I do believe the government is correct, this is a presumption case.  Do you dispute that?

MR. LAWRENCE:  I do believe it's a presumption case, Your Honor.  It's a 5-to-40.  I think the equities are --

THE COURT:  I understand your arguments.  I just want to start with the -- whenever the government says it's a presumption case, I always ask for a response just to see if there's any argument on that.  But I understand your arguments.  But --

MR. LAWRENCE:  Yes, Your Honor.

THE COURT:  -- everyone's in agreement it is a presumption case.

Go ahead, ma'am, raise your right hand.  Madam Deputy will swear you in.

COURTROOM DEPUTY:  Do you solemnly swear or affirm that the answers you will give during today's proceedings will be the truth, the whole truth, and nothing but the truth?

THE WITNESS:  I swear.

COURTROOM DEPUTY:  Please state your name for the record.

THE WITNESS:  Kelly Hobbs.

- - -

**KELLY HOBBS**, **DEFENSE WITNESS**, **SWORN**,

DIRECT EXAMINATION

BY MR. LAWRENCE:

Q.   I know you're nervous.

A.   I am.  No sleep.

Q.   You got to speak louder in the mic.

A.   I'm sorry.  Yes, no sleep.

Q.   Could you give us your address for the record?

A.   685 Lake Stone Circle, Ponte Vedra Beach.

Q.   And what's the zip code there?

A.   32082.

Q.   And how long have you lived at that location?

A.   24 years.

Q.   And does your son, Braden Hobbs, live at that location too?

A.   He does.

Q.   How long has he lived there?

A.   Pretty much his whole life.

Q.   You shake your head.  Is it on and off or --

A.   Well, he went away to college for a year and lived with an old girlfriend; lived with me but stayed with her most of the time.

Q.   And what is your occupation?

A.    I'm a real estate agent.

Q.    How long have you been a real estate agent?

A.    22 years.

Q.    Two years?

A.    22.

Q.    22 years.

       And have you ever been arrested?

A.    No.  Never.

Q.    I noticed -- you are aware that he was arrested for a crime -- a state crime in June of 2024; is that correct?

A.    Yes, I'm aware.

Q.    Were you the one that provided the bond for him?

A.    Yes.

Q.    And since he's been living with you since July 9th, 2024, did you see any reason to believe that he was committing any crimes?

A.    No.

Q.    Did you see any reason to believe that he was committing any of the crimes that are alleged in the indictment?

A.    No.

Q.    Is he currently seeing a --

       THE COURT:  I'm sorry.  Can you clarify the timeline for me, ma'am, when you said that he was sort of partially living with the girlfriend?

       THE WITNESS:  It was years ago.  I wouldn't remember

right off.

THE COURT:  And when was the timeline that he was away at college?

THE WITNESS:  I'm sorry, what's that?

THE COURT:  You said -- I believe you said he was away at college at one point too?

THE WITNESS:  That would have been 2016, 2017.  He graduated in 2016 from high school, went away for his first year.

THE COURT:  Okay.  And so since -- am I correct in understanding since that time frame, other than the time he was with the girlfriend some years ago, he's been mostly at your --

THE WITNESS:  Yes, he's been living at my house --

THE COURT:  Thank you.

THE WITNESS:  -- the majority of the time, yes.

BY MR. LAWRENCE:

Q.   And he lived with the girlfriend -- just as a follow-up to the judge -- after 2017?

A.   Yes.

Q.   Okay.  The indictment in this case runs from 2022 to 2024.  Do you know if he lived with a girlfriend at any time during those years?

A.   No.

Q.   Is it "no, I don't" or "no, he did not"?

A.   No, I don't think so, unh-unh.  No.  I would say no.

MR. LAWRENCE:  Your Honor, may I confer a minute?

THE COURT:  Yes.

(Pause in proceedings.)

BY MR. LAWRENCE:

Q.   Now, let's go back to the therapist.  Are you aware that he's seeing a therapist?

A.   Yes.

Q.   And what is that for?

A.   Drug addiction and -- basically that.

Q.   Were you the one that arranged it?

A.   He did, pretty much.  I helped with it, but he -- he actually found her.

Q.   And where's his therapist?

A.   She's, I believe, in Jacksonville Beach.

Q.   Have you ever gone there before?

A.   I have not gone.

Q.   Have you spoken to her before?

A.   I don't believe so, unh-unh.  I may have spoken to her on the phone briefly, but I don't believe so.

Q.   He tested positive for marijuana.  Were you aware that he was smoking marijuana?

A.   No.

Q.   You are aware that he possessed marijuana when he was 17 years old, right?

A.   Yes.

Q.   How come you're aware?

A.   I was called and I went there.

Q.   You went what?

A.   I was called and I went to the scene and . . .

Q.   The government indicated that he's been Baker Acted.  Were you the one that filed a Baker Act?

A.   No.  I'm not aware of that.

Q.   Do you know what happened with that situation?

A.   I don't.

Q.   Do you know whether he was ever Marchman Act?

A.   No.

Q.   Do you have any guns in your house?

A.   No.

Q.   Have you ever seen Mr. Hobbs with guns?

A.   Yes.

Q.   When was the last time you saw him with guns?

A.   Oh, it's been years, probably, at this point.

Q.   How many?

A.   Probably two years.

Q.   Two years.

A.   Something like that.

Q.   Mr. Hobbs has a passport.  Are you aware of that passport?

A.   Uh-hmm, yes.

Q.   You got to say "yes" or "no" for the record.

A.   Yes.  Sorry, yes.

Q.    Where is that passport located?

A.    I'm not a hundred percent sure.  I could probably locate it.

Q.    It's probably what?

A.    I could probably locate it.

Q.    Do you know if it's still valid?

A.    I -- I imagine it's probably expired.  I believe he got his passport when he was 16.  I believe he got it when he was 16, so I believe it's expired, but I'm not positive.  And I could certainly locate that.

Q.    And when was the last international travel?

A.    Probably five years ago.  We went to Costa Rica on a family trip.

Q.    Where did y'all go?

A.    Costa Rica.

Q.    Now, you indicated to the pretrial services officer yesterday that you want to be a third-party custodian --

A.    Yes.

Q.    -- is that correct?

A.    Yes.

Q.    Do you understand that it comes with responsibilities?

A.    Yes.

Q.    And that any -- if Mr. Hobbs violates any of the Court's term and condition, you are obligated to notify the pretrial services --

A.    Okay, yes.

Q.    -- and the court?  You've got to wait until I'm finished for the record, I'm sorry.

A.    I'm sorry.

Q.    And are you still willing to do that?

A.    Absolutely, yes.

Q.    You understand that if you don't notify the Court of the violations, that you yourself could be in problems?

A.    I understand.

Q.    And you're still willing to be responsible?

A.    Yes.

Q.    Do you feel that Mr. Braden Hobbs should be released on pretrial release?

A.    I do.

Q.    Why?

A.    I do.  Well, he has a good job.  He's been working since his arrest.  And I see a complete change in him.  What he was dealing with before was a horrible addiction.  And I saw a massive change in him.  And I see him back to himself.  He's the Braden that we know and love.

He's very responsible.  He's very dependable.  He's very helpful to me.  He's very respectful to me.  He's actually a joy to have around.  He's a great person.  None of this is who he is.  And for me, I feel like addiction is the center of what's going on, why we're here today.

Q.   Do you have wifi at home?

A.   Uh-hmm, yes.

Q.   Are you willing to turn off the wifi while Mr. Hobbs is placed at your house?

A.   Turn it off?

Q.   Yes.

A.   Yes.

Q.   And are you willing to ensure that he has no -- access to no internet?

A.   Okay.  Yes, absolutely.

Q.   Did I ask you if you have any guns in the house?

A.   You did, and I responded "no."

Q.   Has Mr. Hobbs ever sold you a gun?

A.   No.

Q.   Have you ever seen Mr. Hobbs selling a gun?

A.   No.

Q.   Has he ever given you a gun?

A.   No.  I bought one once --

Q.   When was that?

A.   -- at the store but I don't have it.  Pardon me?

Q.   When did you -- when did you buy one?

A.   Oh, gosh, years ago.  But I'm not a gun person, so . . .

Q.   Do you still -- where is that gun?

A.   I don't have it.  Honestly, I'm hot sure.  I think I sold that to my other son, but I'm not positive.  Or gave it to him,

I should say.

Q.    That's more than ten years, or five years -- or five?  Is it more than five?

A.    Probably five to ten.

Q.    Five to ten.

        MR. LAWRENCE:  Your Honor, may I confer?

    (Pause in proceedings.)

BY MR. LAWRENCE:

Q.    If Mr. Hobbs was detained in the prison -- in the jail pending these proceedings, do you have any fears as to what might happen to him?

A.    Very much, yes.  I'm very concerned about what might happen to him.

        He was out of his mind when he was there before.  He was hallucinating I think before he even got arrested.  He was arrested and completely unconscious.  You know, if it's accurate what was in his system, I think he was on the verge of death.  And then he went into jail and he was hallucinating and having all these thoughts that weren't real from whatever, I guess, was in his system.

        And whatever happened, when I picked him up, he was literally beat to a pulp.  We took him to the hospital and had him examined.  And weeks later I was cutting his hair for him and there were still scabs in huge places on his head.  He was beat really, really badly.

And from I understand, he was moved from one location back to Duval because of the hallucinations.  And he was seeing things, I guess, that weren't there, again, with the drugs that were in his system.  And they moved him back and he was supposed to be protected, from what I understood.  And -- and, again, whatever happened, you know, I don't know.  I just know he was -- he was beat horribly.  And I think it was a few officers involved in that.

Q.   In your job as a real estate agent, do you have flexibility to supervise him at home?

A.   I do.  I do.

Q.   What would you do differently now that you know what's going on in terms -- and if the Court was to allow you to be the third-party custodian?

A.   Well, if I have appointments, either his brother or I could be with him, meaning he can go with me on my appointments.  He was active in real estate.  He got his license at 21 years old and was very excited about that.  And, you know, he's welcome to go with me.

He does have a job.  He was working 8 to 5 every day, so he was leaving by 7:30 and home not till like 6 o'clock every day.  And then we just do dinner and watch TV and go to bed.  And that's Monday through Friday.

And so he's already not been at home alone much at all.  I'm usually there at the same times he is.  But if his

schedule changes, he can work with us, again.

And his brother is also a real estate agent.  He's really busy, but his schedule is flexible as well.  He's actually at an appointment for me right now.  So we trade off and . . .

Q.    How far away does his brother live?

A.    He lives in the Baymeadows area.

Q.    And your house, how many bedrooms is that?

A.    How many bedrooms?

Q.    Yes.

A.    Four.

Q.    And who else lives there with you apart from Mr. Braden Hobbs?

A.    It's us, just the two of us.

MR. LAWRENCE:  No further questions, Your Honor.

THE COURT:  Ms. Adams.

CROSS-EXAMINATION

BY MS. ADAMS:

Q.    Good morning, Ms. Hobbs.

A.    Good morning.

Q.    So you've stated today that the defendant has been living with you at least from 2022 through 2024 up until present?

A.    Yes.

Q.    Are you aware of an address associated with him that's 101 19th Street --

A.    Actually, I was just getting ready to say, I totally forgot about that.  But yes, he moved.  He took an apartment probably five months before his arrest.  And it was basically in Springfield area --

Q.    Did you --

A.    -- because I was very worried.  So he actually did come to my house a lot.  So it was -- I totally forgot that he did actually have that.

Q.    So you were concerned about him living at that house?

A.    Just the area, it was unknown.  And I had not seen it or anything.  So just the area itself.

Q.    Are you aware that he often referred to this location as his, quote, crack house?

A.    No.

Q.    And how long did he live there?  You said --

A.    I -- four or five months.

Q.    Now, you told Mr. Lawrence that you were -- you had all taken a trip to Costa Rica.  Are you aware of his travel to the Bahamas?

A.    Yeah.  We've been to the Bahamas before.  I'm sorry.

Q.    But you told pretrial services you were not familiar with that?

A.    I'm not sure exactly when he's gone to the Bahamas.  We've gone on cruises to the Bahamas before.  We didn't need passports, I don't think.

Q.   That wasn't my question.  My question is are you aware that he has traveled to the Bahamas?

A.   He has in the past, yes.  I'm sorry.

Q.   And you said that if you have a work obligation, that his brother could stay with him.  Is that Garrett or is that Conner?

A.   That's Conner.

Q.   To your knowledge, was Conner aware of what the defendant was involved in?

A.   No, he's not aware of any of these allegations at all.

Q.   Is he aware of Mr. Hobbs's activities?

A.   Not what's described here, no.

Q.   Are you aware that Mr. Hobbs would often drive rental cars?

A.   I do know that he's rented a couple of cars.

Q.   How would you describe his general demeanor, Mr. Hobbs's general demeanor?

A.   At this point in time, himself.  Wonderful.  He's hard working.  He's, like I said, very respectful, dependable, reliable.

Q.   Would you ever describe him as having anger issues?

A.   No.  I've seen him, you know, upset before, but he's never been angry toward me.  So no, I would never describe him as having anger issues.

Q.   Are you aware that he has been a regular user of

controlled substance?

A.    I knew that he had a Xanax addiction.  And I knew he had gone to a doctor and been described that and had got out of hand.

Q.    Were you aware that he was using cocaine?

A.    No.

Q.    What about Adderall?

A.    No.

Q.    What about marijuana?

A.    I knew he had used that in the past.  I know they sell gummies with a certain amount in it or something, so . . .

Q.    What about shrooms?

A.    No.

Q.    So to your knowledge, he has never had a prescription for Adderall?

A.    Not to my knowledge.

Q.    You had told Mr. Lawrence that you had no reason to believe that the defendant would have committed the crimes alleged in the indictment; is that correct?

A.    Right.

Q.    So you were not aware that he was selling drugs?

A.    No.

Q.    And you were not aware that he was selling guns?

A.    I knew he had bought guns in the past, and I knew that he had sold a couple, my understanding was to friends or, you

know, people he knew, rarely.  I'm not a person that's comfortable with guns, period.

Q.    Does your phone number end in 3803?

A.    It does.

Q.    And so you've stated today that you did not know that he was selling or dealing in guns?

A.    I knew that he was selling -- he had sold a few, but I didn't know -- like I didn't know any of what's described today.  I certainly was concerned with his state of mind.  And I personally just don't like guns.  I did check in to the sale of guns, the legality of it, and I was told that it's legal, there's no limit, that kind of thing.

Q.    You understand that that only applies to a personal collection and not somebody going to an FFL and purchasing 120 firearms?

A.    I had no idea it was that.

Q.    So he lived with you all this time and you did not know that he was using cocaine, using Adderall, or using shrooms, correct?

A.    No.

Q.    And you were not aware that --

THE COURT:  I'm sorry, we have a double negative there.  Are you saying no, you were -- she asked if that was correct and you said no.  I think you're saying no --

THE WITNESS:  Oh, I'm sorry.

THE COURT: -- you're not aware. Is that what you intended?

Do you want to repeat the question, Ms. Adams?

BY MS. ADAMS:

Q. Were you -- so you were not aware while he was living with you that he was using cocaine, Adderall, or shrooms?

A. I was not aware that he was using cocaine, Adderall, or shrooms.

Q. And you were not aware about the volume of firearms that he was moving?

A. No.

Q. Do you recall asking him at one point how he was affording the car that he had purchased?

A. Probably, but no, I don't recall asking that. I know he had sold his other car. I did not know he got a loan for the new one. So yeah, that's probably what I was asking.

Q. Do you recall him telling you, "I deal in cryptocurrency and guns"?

A. No. I knew he had crypto. And we had conversations about him selling guns because he knew that I wasn't comfortable with that because I didn't know how that worked. So that's why I made those phone calls or checked in to . . .

Q. Do you recall sending him a press release from the United States Attorney's Office in April of 2024 regarding an individual named Scott Chance?

A.    I don't.  But I wouldn't be surprised.  I send my kids stuff all the time.

Q.    Would it help refresh your memory if you got to look at some of the messages?

A.    Sure.

      (Pause in proceedings.)

A.    Yeah, this is when I was worried about whether selling guns was legal or not.  So, yeah, that looks like something I would do.

Q.    So you were concerned about the sale of illegal firearms?

A.    I didn't -- I was concerned if it was legal.  I did find out that it's legal and there's no limit, is what I was told.

Q.    But you also sent him a message that says, quote, Dipshit, you're missing the part that says you, exclamation mark, exclamation mark, exclamation mark, must have a license, exclamation mark, exclamation mark, exclamation mark, correct?

A.    Okay.  Maybe, but I did ask if somebody had to have a license and I was told no.  I thought for business you have to have a license for -- to sell anything.  Except it was described to me like it's selling a piece of furniture on Craigslist or whatever, so . . .

Q.    You also gave him repeated warnings to stop, essentially, the conduct that he was engaged in, correct?

A.    I didn't know what he was engaged in, but I could see a change in him with this addiction.  And I knew that he had

bought guns before and sold them, but -- so I'm just throwing anything out to him when I'm seeing this addiction because I didn't know what he was, you know, doing when he wasn't around me.  But I was very worried about his state of mind.

Q.   You love your son very much, correct?

A.   I'm sorry, what was that?

Q.   You love your son very much?

A.   Oh, very much.

Q.   And you would do anything for him?

A.   I -- yes.  I mean...

Q.   And you had -- just quickly, you had asked Mr. Lawrence -- or Mr. Lawrence had asked you whether or not you have any guns in the house and you said no; is that correct?

A.   Correct.

Q.   Does Braden have any guns at the house?

A.   He does not.

        MS. ADAMS:  I have no more questions, Your Honor. I'll have rebuttal.

        THE COURT:  Mr. Lawrence, any redirect?

        MR. LAWRENCE:  Nothing further, Your Honor.

        THE COURT:  All right, ma'am.  Thank you.  You can step down.

        THE WITNESS:  Thank you, Your Honor.

        THE COURT:  All right.  Are you -- Mr. Lawrence, do you still have presentation?

MR. LAWRENCE:  Your Honor, I have nothing further to add at this point.

THE COURT:  All right.  Ms. Adams.  Ms. Adams, let me ask a couple follow-up questions, actually, then I'll let you present whatever else you want to prepare.

But can you -- there was something in the presentation -- your initial, I meant to ask and I forgot -- about possible out-of-state warrants.  I think you said maybe Pennsylvania, but I didn't quite follow that.

MS. ADAMS:  Yes, Your Honor.  It was a local warrant to St. Johns County that the defendant -- there was a motion filed by a defense attorney on the defendant's behalf to re-call a capias, and when the defendant was discussing that with customers, other friends, other individuals, he indicated that he had to flee to Pennsylvania to avoid the warrant.  And he essentially paid his attorney to help get the warrant re-called.

And he indicated he could not fly to Pennsylvania to hide out from law enforcement because if he had flown, they would have arrested him.  And so he had to drive.  And he said that he hid out on a family estate.

THE COURT:  Is that the -- is that what's at the bottom of page 4 of the report, or is that something else?

MS. ADAMS:  I'm not sure, Your Honor.  I'd have to look back at the actual message.  It does have a St. Johns

County case number from 2020 on the message from my recollection, so I do believe that is what it would be.  But he indicated that he failed to appear and that's why we had to flee.

THE COURT:  Okay.  And then could you -- I know you touched on it briefly, but could you just refresh my memory on the controlled buys, you said.

MS. ADAMS:  Yes, Your Honor.  The Florida Department of Law Enforcement and ATF conducted a series of controlled purchases.  There were four completed purchases, five attempted purchases from two other individuals in St. Johns County.  And during the course of those transactions they purchased 11 firearms from those individuals.  And several other firearms were originally purchased by the defendant.

THE COURT:  Okay.

MS. ADAMS:  So those individuals -- and based on the communications and what we have from the defendant's iCloud, those individuals were customers of the defendant.  So the defendant would sell them firearms, knew that those individuals were going to be essentially flipping the guns and reselling the guns to other people.

THE COURT:  And so the controlled purchases were from the individuals who had purchased from the defendant, not from the defendant directly?

MS. ADAMS:  Correct, yes, Your Honor.

THE COURT: All right. Thank you.

MS. ADAMS: Your Honor, just to touch on a few things, I'll start with some of the arguments that defense counsel made indicating that, you know, it -- the defendant's young and he can often inflate things for essentially clout. But we know based on the evidence the defendant is not pretending in this situation. We have multiple witnesses and records to corroborate these statements the defendant is making.

In reviewing the DUI, whether or not a breathalyzer is negative is irrelevant in this situation given that the allegation of the DUI involves drugs, and drugs do not pop up on a breath test.

As far as the marijuana is concerned, it's unrealistic, and frankly illegal, if he's purchasing it from a smoke shop given that marijuana is illegal both for recreational use in the state of Florida as well as federally. So that -- they're not allowed to sell it in stores outside of the lawful dispensaries under the medical marijuana provisions of the statute.

Additionally, the defendant, according to his mother, is seeing a therapist for his drug addiction, yet he's still continuing to use controlled substances while he's undergoing that drug treatment, which would indicate that he would be uncompliant while on release.

The defendant, as Mr. Lawrence indicated, is not a felon, that is correct.  However, addicts are still prohibited from possessing and purchasing firearms under federal law.  And that's inherently involved in this matter as the defendant is charged with lying to a federally licensed firearms dealer about that very issue of possessing or being a user of controlled substances.

In turning, Your Honor, to Mrs. Hobbs, I appreciate her being here today and understand that she is willing to do anything for her son.

She indicated to Your Honor today that her son does not have anger issues, that he's nonviolent.  However, she sent the defendant a text message that states, quote, You have anger issues.  You're all over the place, and you're irrational and fly off the handle.

And there's other communications where she's -- it's clear that she knows what he's doing.  She states, "It's not okay to put people through your choice of drug use."

He's told her repeatedly -- she questions him repeatedly about what he was doing and his behavior.  She tells him at one point, "This behavior I don't like.  It's nuts and you won't stop."

He sends her horrible communications, Your Honor, berating her for checking in on him.  At one point she refers to him as being verbally abusive and telling him that she just

can't let that go.

She's very aware of what he was doing based on the communications that they have together. Sending -- he sends her audio messages describing that he was selling guns and that the guns that he was selling are purchased from legal vendors, and so therefore he's not the same as the individual who's charged with the illegal sale of firearms in the press release that she sends out. However, it's very clear that she knows that he must have a license in order to do the business that he was engaged in.

The defendant has lived with her this entire time. Taking her testimony today, she said that she was not aware that he's been using controlled substances. She was not aware that he was moving firearms at the volume that he was moving them at. And so how could we anticipate that she would know or be able to detect any of the indicators that would need to be present for her to be able to make a suitable third-party custodian? But again, Your Honor the communications contradict the testimony that was presented to Your Honor today.

The defendant has been living with her for most of his adult life he's been engaged in this activity. And to her credit, she did repeatedly tell him to stop engaging in this illegal activity and to stop using any of the drugs, yet the defendant did not listen to her and continued to do what he wanted and would even verbally attack her for asking him to

stop and to get his life together.  If the defendant was not willing to listen to her then, then we cannot trust the defendant is willing to listen to her now or that she would be able to keep a good, watchful eye on the defendant.

Your Honor, the United States, again, believes that the defense has not overcome the presumption in this case and we also believe that Ms. Hobbs is not a suitable third-party custodian.

THE COURT:  Mr. Lawrence.

MR. LAWRENCE:  Your Honor, I beg to differ with the government's assessment.  First of all, you know, we don't have copies of the text messages that were shown to the witness as a -- for iden- -- I guess for identification purposes.

But be that as it may, it's my position, Your Honor, that Mrs. Hobbs testified very credibly that she was more concerned with his addiction.  And she testified that the defendant -- the text messages -- she was concerned about the sale, like any mother would be.

And now that -- if she's willing -- and she now knows the knowledge that X, Y, and Z.  If she's willing to put herself as a third-party custodian, she's even more acute.

If she had said nothing or done nothing, the government would be here saying, "What kind of mother is this? She didn't even say anything."  Now that she said something, it's like, oh, it's not good enough or it's not enough.

And I would submit to the Court that if Mrs. Hobbs becomes the third-party custodian that she'd be more sensitized to ensure that her son followed the terms and conditions of the pretrial release because of the fact that she has a lot to lose.  She's not a stay-at-home mom with nothing.  She's a real estate agent for the state of Florida -- licensed in the state of Florida for over 22 years.  Obviously very successful, to the point where she's able to keep a four-bedroom house in a very nice area, such as Ponte Vedra Beach or St. Johns.  A very successful entrepreneur.  And so I think she would be a suitable third-party custodian.  And I beg to differ with regards to the government's assessment.

With regards to Mr. Hobbs, Your Honor, his addiction, it -- as the Court is well aware, the pretrial service has an opportunity to set him up for additional evaluation.  And then after the evaluation they can think about whether -- outpatient treatment that he can have with regards to whether it's a daily or weekly or biweekly treatment with a provider that's under the pretrial services regimen.

So I believe, Your Honor, that the fact that Mr. Hobbs has significant ties to the community, he's been here for most of his life, and that this prior criminal history is not that serious, we've seen worse, and there are no felony convictions, and so I think that the Court can fashion some terms and conditions to allow Mr. Hobbs to remain -- to be on

bond.

Thank you, Your Honor.

THE COURT:  Thank you.

Ms. Adams, anything further?

MS. ADAMS:  No, Your Honor.

THE COURT:  All right.  The government's sought detention both under 3142(f)(1) and under 3142(f)(2).

As all sides agree, and the Court also agrees, there is a rebuttable presumption under 3142(e)(3) based on the drug -- drug crime with a maximum term of imprisonment of ten years or more.  I don't believe the defendant's introduced sufficient evidence to rebut the presumption, and detention is warranted on that basis.

I do thank Ms. Hobbs for being here.  And Mr. Hobbs, you're very fortunate to have the support, and that will suit you well.

I do have concerns, though, as to a third-party custodian, essentially for the reasons argued by the government.  There was some inconsistency in the testimony.  And whether it is a lack of awareness and these allegations were occurring, you know, when already living there or a -- being partially aware but not entirely or not, you know, with the -- with the mother/son relationship, sort of seeing the full extent of what's going on or whether just some of the answers today were a little bit inconsistent, I don't believe

that the presumption's been rebutted.

Even if it had been, once the presumption's rebutted, it's still a factor that's considered. And I do believe the government's shown both by clear and convincing evidence that no condition or combination of conditions will reasonably assure the safety of any other person in the community, and also by a preponderance of the evidence that no condition or combination of conditions of release will reasonably assure defendant's appearance as required.

The act requires me to consider the nature and circumstances of the alleged offense, the weight of the evidence against the defendant, the history and characteristics of the defendant, the nature and seriousness of the danger to others or to the community.

I think Mr. Lawrence made an effective presentation, and I appreciate the arguments, but I do believe that those factors favor detention. I think the nature and circumstances of the alleged offense and the weight of the evidence strongly weigh in favor of detention. These are very, very serious crimes. Again, for essentially the reasons argued by the government, not only is there a presumption just based on the drug offense, but then there's the multiple firearms offenses, the very dangerous activity related to both drugs and firearms. The weight of the evidence does appear to be strong.

In addition to the strong weight of the evidence, and

considering the factors that I mentioned previously, Mr. Hobbs is subject to a lengthy period of incarceration if convicted. There's been indications of participation in criminal activity while on probation, parole, or supervision.  There's been a history of violence or use of weapons.  History of alcohol and substance abuse appears to be quite strong.  There's also been some evidence of attempts to evade law enforcement both in inconsistent answers given to law enforcement, the use of the rental cars, and the other proffer offered by the government. And the background information of the defendant is at least partially unknown or unverified.  And again, as discussed, there's been some inconsistencies in that regard.

There's also been prior violations of probation, parole, or supervised release, including a drug use while on release and, as previously discussed, the battery issue that occurred, or was proffered to have occurred following the prior state court arrest.

So, again, considering the nature and circumstances of the alleged offense, the weight of the evidence against the defendant, the history and characteristics of the defendant, and nature and the seriousness of the danger to others or the community, for the reasons stated by the Court, I will grant the government's motion and order Mr. Hobbs detained during the pendency of this matter.

Anything else to take up before we turn to

arraignment?

MS. ADAMS:  No, Your Honor.

MR. LAWRENCE:  What was the question, Your Honor?

THE COURT:  Is there anything else before we turn to arraignment?

MR. LAWRENCE:  Nothing further, Your Honor.

THE COURT:  All right.  Mr. Hobbs, are you currently under the influence of any drugs, medication, or intoxicant?

THE DEFENDANT:  No, Your Honor.

THE COURT:  Do you clearly understand where you are, what you're doing, and the importance of this proceeding?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  All right.  I'll advise you you have a constitutional right to remain silent.  You do not have to make a statement.  You do not have to give a statement at any time to any law enforcement agent.  If you do make a statement, anything you say can be used against you in court, including in later proceedings in this case.  If you made a statement in the past, you need not make a statement in the future.

Do you understand that right?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  You have the right to plead guilty and by doing so admit the truth of the charges against you.  If you do that, there will be no trial, and on your plea the Court will find you guilty and will convict you.  The next step will be

the preparation of a presentence investigation report followed filed by district -- sentencing by a district judge.

You also have the right to plead not guilty and to maintain that plea.  If you plead not guilty you're entitled to the following rights under the constitution and other laws of the United States:

You have the right to a trial by a jury of 12, all of whom would have to unanimously agree on your guilt before you could be convicted of these crimes.

Throughout these proceedings and all others you're presumed innocent.  The government would have to overcome that presumption and prove you guilty beyond a reasonable doubt. You would not have to prove that you're innocent.

At trial, witnesses for the government have to come into court and testify in your presence.  Your counsel can cross-examine them, object to the evidence, and offer evidence on your behalf.

You can present witnesses in your own defense at trial.  If your witnesses will not come in voluntarily, I could issue orders to make them come.

At trial you have the right to choose whether or not to testify.  That choice is entirely up to you.  No one could force you to testify or to not testify.

You have the right under the Speedy Trial Act to be brought to trial within a specified period of time.  That's

generally 70 days, but there are exceptions your lawyer can explain to you.

If you're convicted, you have the right to have a court of appeals review the rulings of the trial court to determine if your conviction or sentence should be reversed because either or both were improperly obtained.

Do you understand those rights?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Any questions?

THE DEFENDANT:  No, Your Honor.

THE COURT:  Do you have a copy of the indictment?

THE DEFENDANT:  No, Your Honor.

THE COURT:  All right.  I think -- I think you had received it earlier, but let's make sure you have a copy.

Mr. Lawrence, do you have a copy?

MR. LAWRENCE:  (No audible reply.)

THE DEFENDANT:  Yes.

THE COURT:  Okay.  All right.

Mr. Hobbs, do you now have a copy of the indictment?

THE DEFENDANT:  Yes.

THE COURT:  Mr. Lawrence, would you like Ms. Adams to read the indictment or will a summary suffice?

MR. LAWRENCE:  A summary is fine, Your Honor.

THE COURT:  All right.  Ms. Adams, if you would.

MS. ADAMS:  Your Honor, after advising him of the

charges, would Your Honor like me to re-advise him of the penalties?

THE COURT:  I think you can just do the charges at this point.

MS. ADAMS:  Yes, Your Honor.

Mr. Hobbs, you are charged in a six-count indictment. Count One charges you with firearms trafficking conspiracy beginning on an unknown date, but no later than in or about March of 2022, and continuing through in or about June of 2024, in violation of 18, United States Code, Section 933(a)(3).

Count Two charges you with conspiracy to deal firearms without a license beginning on an unknown date, but no later than in or about March of 2022, and continuing through in or about June of 2024, in violation of 18, United States Code, Sections 371, 922(a)(1)(A), 923(a), and 924(a)(1)(D).

Count Three charges you with dealing firearms without a license beginning on an unknown date, but no later than in or about March of 2022, and continuing through in or about June of 2024, in violation of 18, United States Code, Sections 922(a)(1)(A), 923(a), and 924(a)(1)(D).

Count Four charges you with making a materially false statement to a firearms dealer, occurring on or about April 17th of 2024, in violation of 18, United States Code, Section 922(a)(6) and 924(a)(2).

Count Five charges you with a drug trafficking

conspiracy beginning on an unknown date, but not later than in or about March of 2022, and continuing through in or about June of 2024, in violation of 21, United States Code, Sections 846 and 841(a)(1) and (b)(1)(B)(ii).

Count Six charges you with possession with intent to distribute a controlled substance, occurring on or about June 26th of 2024, in violation of 21, United States Code, Sections 841(a)(1) and 841(b)(1)(c).

The indictment also contains a forfeiture provision.

THE COURT:  All right.  Thank you.

Mr. Hobbs, do you understand the charges against you?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  And do you still understand the penalties?  Those were discussed at your initial appearance.

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Mr. Lawrence, any reason Mr. Hobbs should not enter a plea at this time?

MR. LAWRENCE:  No reasons, Your Honor.

THE COURT:  And how does he plead?

MR. LAWRENCE:  Not guilty to all six counts in the indictment, Your Honor.

THE COURT:  All right.  Court will enter a not guilty plea on your behalf, Mr. Hobbs, to each and every charge in the indictment.

I have on the bench a Notice of Acceptance of General

Discovery.  Mr. Lawrence, is that correct?

MR. LAWRENCE:  That is correct, Your Honor.

THE COURT:  All right.  The case is set before Judge Howard.  Trial will be -- trial date June 2nd, 2025, at 9 a.m., with the status on May 19th, 2025, at 3 p.m.

What's the status of the discovery, Ms. Adams?

MS. ADAMS:  Your Honor, I -- we were able to confirm yesterday that Mr. Lawrence has a drive in our office that's about 50 gigabytes.  I've advised Mr. Lawrence that I don't believe that that will be large enough given the size solely of the iCloud extraction.

Given all of that, I believe that we could have him at least the first round of discovery by April 9th.  And then I will coordinate with Mr. Lawrence to get an additional drive for the remaining items.

THE COURT:  All right.  Mr. Lawrence, does that work?

MR. LAWRENCE:  That is acceptable, Your Honor.

THE COURT:  All right.  So I'll set an April 9th discovery deadline with a motions deadline for April 23rd.

Is the government willing to do a reciprocal exchange of witness lists and Jencks Act material?  And if so, how many days before trial?

MS. ADAMS:  Yes, Your Honor.  Three calendar days prior to trial.

THE COURT:  Mr. Lawrence?

MR. LAWRENCE:  That's acceptable, Your Honor.

THE COURT:  All right.  As required by Rule 5(f), the United States is ordered to produce all exculpatory evidence to the defendant pursuant to *Brady v. Maryland* and its progeny. Not doing so in a timely manner may result in sanctions, including exclusion of evidence, adverse jury instructions, dismissal of charges, and contempt proceedings.

MS. ADAMS:  Yes, Your Honor.

THE COURT:  Is there anything else in this matter today?

MS. ADAMS:  Nothing from the United States, Your Honor.

MR. LAWRENCE:  Nothing from the defense, Your Honor.

THE COURT:  All right.  Court will be in recess.

COURT SECURITY OFFICER:  All rise.

(Proceedings concluded at 10:35 a.m.)

-    -    -

CERTIFICATE OF OFFICIAL COURT REPORTER

UNITED STATES DISTRICT COURT)

MIDDLE DISTRICT OF FLORIDA )


I, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.


DATED this 5th day of May, 2025.


/s/ Katharine M. Healey
Katharine M. Healey, RPR, RMR, CRR, FPR-C
Official Court Reporter